WOLFORD v DUNCAN

Docket No. 277080. Submitted June 11, 2008, at Detroit. Decided July 17, 2008, at 9:00 a.m. Leave to appeal sought.

Drema Wolford, as personal representative of the estate of decedent Franklin Wolford, brought a wrongful-death medical-malpractice action against family practitioner Deborah L. Duncan, M.D., physician's assistant Deborah Wilson, and the Fenton Medical Center relating to the treatment the decedent received from the defendants. The court, Richard B. Yuille, J., entered judgment on a jury verdict of no cause of action. The plaintiff appealed.

The Court of Appeals *held*:

1. The trial court did not err by denying the plaintiff's motion to exclude the expert testimony of defendants' witness Ronald Nelson on the appropriate standard of care applicable to a physician's assistant. The defendants had contended that Nelson was not a qualified expert under MCL 600.2169(1)(a) or (c) because he was a physician's assistant to an internist while Wilson was a physician's assistant to a family practitioner. However, the matching-qualifications requirements of MCL 600.2169(1)(a) and (c) pertain only to expert witnesses who are specialists in or general practitioners of human medicine and thus do not apply to a physician's assistant testifying as an expert witness. Nelson was qualified under MCL 600.2169(1)(b)(*i*), which applies to all health professionals, because, during the year immediately preceding the death of the decedent, he devoted a majority of his professional time to the active clinical practice of the same health profession, physician's assistant, as Wilson.

2. The trial court did not err by denying the plaintiff's motion to strike the testimony of Dr. James Setchfield that the decedent probably died from an "intracranial process." During the trial, the plaintiff did not challenge, as she does on appeal, the testimony on the basis that it was speculative or lacked a proper foundation. Rather, the plaintiff cross-examined the witness with the witness's deposition testimony that the witness had no opinion on causation. Having failed to seek the trial court's intervention and having decided to present the jury an issue of witness credibility, the plaintiff cannot now claim that the trial court erred by not striking the testimony.

3. The trial court did not err by permitting Dr. James Martin to testify regarding the cause of the decedent's death. By failing to raise them below, the plaintiff failed to preserve for appeal claims that the witness had not been identified by the defense as a witness on causation and that the testimony was speculative. There is no plain error affecting the plaintiff's substantial rights with respect to this claimed error.

Affirmed.

WITNESSES — EXPERT WITNESSES — MEDICAL MALPRACTICE.

"Specialist" and "general practitioner," as used in the statute governing the qualification of expert witnesses in medical-malpractice actions, pertain to physicians only, not to other health professionals (MCL 600.2169[1][a], [c]).

*Grysen & Associates* (by *B. Elliott Grysen*) for the plaintiff.

*Plunkett Cooney* (by *Robert G. Kamenec* and *Hillary A. Dullinger*) for the defendants.

Before: WHITE, P.J., and WILDER and KELLY, JJ.

PER CURIAM. In this wrongful-death medical-malpractice action, plaintiff appeals as of right a jury verdict and court judgment of no cause of action. We affirm.

I

Plaintiff's decedent sought treatment from defendant Fenton Medical Center on July 24, 2001. He had symptoms of pain in the left side of his chest, left arm, and neck. Defendant Deborah Wilson, a licensed physician's assistant supervised by defendant Deborah Duncan, M.D., a family-practice physician, examined him. She found that his pulse and blood pressure were normal, and he was not short of breath, but he had sounds (i.e., "rales") in his lungs. He also had tender-

ness in his chest wall, and his chest pain did not increase with exertion. She ordered a chest x-ray and electrocardiogram (EKG). The EKG was normal, but the chest x-ray showed that some air sacs in his lungs had collapsed. Wilson diagnosed the decedent as having pneumonia and prescribed an antibiotic.

Two days later, the decedent complained of a severe headache, which made him feel like his head was bursting. An ambulance was called, but the decedent died before he arrived at the hospital. No autopsy was performed before the decedent's interment. His remains were exhumed a year later for a partial autopsy of his lungs and heart. The pathologist found blood clots in the decedent's lungs, but the parties' experts disputed whether these clots formed before or after his death.

Plaintiff brought this action alleging that the decedent's recent history of deep vein thrombosis should have alerted defendants to the possibility of a pulmonary embolism (blood clot or clots blocking the flow of blood to the lungs) or a cardiac problem requiring urgent care. Plaintiff alleged that a physician's assistant and a family-practice physician following the appropriate standard of care would have immediately hospitalized the decedent for treatment with blood-thinner medication and additional tests to confirm or rule out an acute pulmonary or cardiac condition. Defendants maintained that the decedent did not show any indications of a life-threatening condition when Wilson examined him, and they disputed plaintiff's claim that the decedent died from a pulmonary or cardiac condition caused by blood clots.

II

Plaintiff first argues that the trial court erred by denying her motion to strike Ronald Nelson as defen-

dants' expert witness regarding the appropriate standard of care for a physician's assistant. Plaintiff argues that Nelson was not qualified as an expert under MCL 600.2169(1) because his supervising physician specialized in internal medicine and Wilson's supervising physician, Dr. Duncan, specialized in family practice. This issue presents a question of statutory interpretation, which we review de novo. *Tomecek v Bavas*, 276 Mich App 252, 260; 740 NW2d 323 (2007).

MCL 600.2169(1) provides:

> In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.
>
> (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:
>
> (*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.
>
> (*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an

accredited health professional school or accredited residency or clinical research program in the same specialty.

(c) If the party against whom or on whose behalf the testimony is offered is a general practitioner, the expert witness, during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i*) Active clinical practice as a general practitioner.

(*ii*) Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed.

Defendants contend that the terms "specialist" and "general practitioner" refer only to physicians and that the criteria set forth in § 2169(1)(a) and (c) therefore apply only to physicians, not physician's assistants or other nonphysician health professionals. The statute does not define the terms "specialist" or "specialty."

In *Woodard v Custer*, 476 Mich 545, 561; 719 NW2d 842 (2006), our Supreme Court construed the term "specialty" to mean "a particular branch of medicine or surgery in which one can potentially become board certified." In *Cox v Flint Bd of Hosp Managers*, 467 Mich 1; 651 NW2d 356 (2002), our Supreme Court held that MCL 600.2912a, which sets forth the applicable standards of care for general practitioners and specialists in medical-malpractice actions, does not establish a statutory standard of care for nurses. The Court held that the terms "general practitioner" and "specialist" apply only to physicians; therefore, nurses are subject to the common-law standard of care. *Id.* at 18-20. In *Brown v Hayes*, 270 Mich App 491, 499-500; 716 NW2d 13 (2006), rev'd in part on other grounds 477 Mich 966 (2006), this Court held that under *Cox*, the terms

"specialist" and "general practitioner" apply only to physicians, and therefore § 2961(1)(a) and (c) are not applicable in determining the qualifications necessary to testify regarding the appropriate standard of care for an occupational therapist. *Id.* at 499-500.

The trial court's denial of plaintiff's motion to exclude Nelson's testimony is consistent with this Court's decision in *Brown*, and with the Supreme Court's construction of "specialty" as "a particular branch of medicine or surgery in which one can potentially become board certified" in *Woodard, supra* at 561. Section 2961(1)(a) and (c) apply, respectively, to specialists and general practitioners, but these terms refer only to physicians, not other health professionals. A physician's assistant is not a physician; therefore, the criteria set forth in § 2961(1)(a) and (c) do not apply. *Brown, supra.* Further, the statutes pertaining to licensing for physician's assistants do not recognize board certification in any specialty. See MCL 333.17060 through 333.17082. A physician's assistant cannot be a specialist in accordance with the Supreme Court's construction of that term in *Woodard, supra.* It is significant that a physician's assistant need have no special certification to work under a physician who is a specialist. Both Wilson and Nelson were eligible to work under either a family-practice physician or an internal-medicine physician.

Plaintiff argues that notwithstanding the foregoing, a different result must obtain in the instant case because MCL 333.17078(2), a statute pertaining to physician's assistants, states that a physician's assistant "shall conform to minimal standards of acceptable and prevailing practice for the supervising physician." We disagree. While this provision states the standard of care applicable to a physician's assistant, and an expert witness must demonstrate familiarity with that stan-

dard to be qualified to offer expert testimony, it does not follow that physician's assistants are specialists under § 2961(1)(a).

Thus, neither § 2169(1)(a) nor § 2169(1)(c) apply to defendant's choice of an expert witness regarding the appropriate standard of care for Wilson; rather, the expert's qualifications are governed by § 2169(1)(b), which applies to both physicians (specialists and general practitioners) and other health professionals.[1] *Brown, supra* at 500. During the year preceding the decedent's death, Nelson devoted a majority of his professional time to active clinical practice as a physician's assistant, the same health profession to which Wilson belongs. Accordingly, he was qualified as an expert witness pursuant to § 2169(1)(b)(*i*).

III

Plaintiff next argues that the trial court erred by denying her motion to strike Dr. James Setchfield's testimony opining that the decedent probably died from an "intracranial process." Plaintiff argues that this testimony was improper because it was speculative and lacked foundation, contrary to MRE 702. She also complains that defendants failed to disclose Dr. Setchfield as an expert witness on the issue of causation and that he was not qualified to offer this opinion. We review preserved evidentiary issues for an abuse of discretion, *Woodard, supra* at 557, and unpreserved issues for plain error affecting plaintiff's substantial rights, *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 700; 630 NW2d 356 (2001); MRE 103(a)(1).

---

[1] Of course, Nelson's testimony was also subject to MRE 702. However, plaintiff does not challenge his testimony on this basis.

At trial, plaintiff cross-examined Dr. Setchfield on these issues and did not challenge his testimony until he was excused from the stand. At that point, plaintiff objected to the testimony on the ground that it was speculative, but did not object on the other grounds asserted on appeal. The trial court ruled:

> It can't be proved or it can't be disproved is the way he put it. He did have a medical basis at least in his mind for stating that opinion.
>
> I actually think it was improper, but I think as well that it is a theory that he supported with the record and I think [plaintiff's counsel] cross-examined him on the issue, and I am not going to strike it from the jury's consideration. I don't think it's worth much, but I am not going to tell them that.

Plaintiff never objected on the basis that defendant failed to alert plaintiff that Dr. Setchfield would offer causation testimony. Rather, plaintiff cross-examined Dr. Setchfield on his deposition testimony that he had no opinions on causation. Having opted not to seek the trial court's intervention on this basis, but rather to present it to the jury as an issue of credibility, plaintiff cannot now claim that the trial court erred by not striking the testimony on that basis. We find no plain error affecting plaintiff's substantial rights. *Hilgendorf*, *supra* at 700. Similarly, we review the court's decision to let the testimony stand in the context that plaintiff failed to object when the testimony was offered and chose instead to cross-examine on the issue, only to later move to strike the testimony on the basis that it was too speculative. The trial court did not abuse its discretion by ruling that at that point, in light of the fact that the witness offered a medical basis for his opinion, relating it to the decedent's symptoms, and also clearly acknowledged that it could not be proved or

disproved, the court would leave it to the jury to decide what weight to give to the testimony. *Woodard, supra* at 557.

IV

Plaintiff also argues that the trial court erroneously permitted Dr. James Martin to testify regarding the decedent's cause of death. We reject this claim for similar reasons. Defense counsel questioned Dr. Martin regarding the care given the decedent on July 24, 2001. Dr. Martin testified that he found nothing inappropriate in the treatment. Defense counsel continued:

*Q.* Can you see anything on the 24th that was going to be a predictor of Mr. Wolford's death some three days later?

*A.* Nothing there. No. Nothing.

*Q.* And today is there any way to predict what caused his death?

*A.* Autopsy.

*Q.* Okay.

*A.* Complete autopsy.

*Q.* And we only have an autopsy of the lungs and the heart.

*A.* That's what I understand.

*Q.* Do those autopsy findings predict his death or tell us why he died?

*A.* No.

Plaintiff's counsel then objected: "Objection. Foundation. He's not a pathologist. He has not established that within a year—in 2001 or a year prior that he was doing coronary work." The court overruled the objection. Defense counsel continued and told the witness·that counsel was asking him to answer in his capacity as a family practitioner. Counsel then inquired whether Dr.

Martin reviewed autopsy results in his practice and asked a series of questions regarding whether patients who die from heart attacks and pulmonary embolisms have severe headaches immediately before death. Defense counsel then asked Dr. Martin whether, from a clinical standpoint, the fact that the decedent had a severe headache immediately before dying was significant. Dr. Martin answered that the decedent's massive headache caused him to "wonder if there isn't something cerebral going on, in his brain." Defense counsel continued:

*Q.* How can something in your brain kill you?

*A.* You can have several things. You can have a regular artery rupture and bleed or you can have an aneurysm. At the base of [sic] brain there is a little circle of vessels. Remember, if you're old enough to remember the old tires that would get a balloon on the side, well, that's sort of what an aneurysm is. It's a bulging out in a weak spot and when that ruptures that is like turning a fire hose loose in your living room and squirting your TV and your electrical and sound equipment, it goes out. That's what happened to Mr. Wolford. It sounds like he had that.

*Q.* Is there any—what else can cause sudden death?

*A.* Sudden death?

*Q.* Sudden death.

*A.* Something cerebrally in the brain, a heart attack, you could have an arrhythmia, and a big pulmonary embolus. Those cause sudden death.

*Q.* Anything other than a brain issue that you can think of that would cause sudden death in Mr. Wolford from your review?

*A.* You have to restate it. I couldn't hear you.

*Q.* Is there anything that you've seen about this case that points to the heart having caused the sudden death?

*A.* No.

*Q.* How about a [pulmonary embolism]?

*A.* No.

Plaintiff's counsel made no objection to the foregoing testimony, except the initial objection set forth above regarding the doctor's response to the autopsy question. We conclude that plaintiff failed to preserve the challenges raised on appeal. Our review is thus for plain error affecting plaintiff's substantial rights. *Hilgendorf, supra* at 700; MRE 103(a)(1).

We reject plaintiff's argument that the trial court's ruling on the initial objection "permitted Dr. Martin to ramble on for three pages as to the possible causes of Mr. Wolford's death." Nothing precluded plaintiff from objecting on the basis that Dr. Martin was not identified as a causation witness or that his testimony was speculative. Further, the court's initial ruling on the objection to the question whether the autopsy predicted the decedent's death or told why he died did not foreclose objection to the testimony plaintiff now challenges on appeal. We find no plain error affecting plaintiff's substantial rights. *Hilgendorf, supra* at 700.

Affirmed.